IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2015 Session

## STATE OF TENNESSEE v. GARRICK GRAHAM

**Appeal from the Criminal Court for Sullivan County**
**No. S60426     Robert H. Montgomery, Jr., Judge**

_____

**No. E2014-01267-CCA-R3-CD – Filed March 8, 2016**

_____

Defendant, Garrick Graham, and his Co-Defendant, Bashan Murchison, were convicted of numerous drug offenses by a Sullivan County Jury.  Specifically, Defendant Graham was convicted of three counts of delivery of .5 grams or more of cocaine (counts 1,3,5), three counts of sale of .5 grams or more of cocaine (counts 2, 4, 6), delivery of .5 grams or more of cocaine within 1,000 feet of a recreation center (count 7), sale of .5 grams or more of cocaine within 1,000 feet of a recreation center (count 8), facilitation of delivery of .5 grams or more of cocaine within 1,000 of a school (count 9), facilitation of .5 grams or more of cocaine within 1,000 feet of a school (count 10), facilitation of delivery of .5 grams or more of cocaine within 1,000 feet of a daycare (count 11), facilitation of sale of .5 grams or more of cocaine within 1,000 feet of a daycare (count 12), delivery of .5 grams or more of cocaine (count 13), facilitation of sale of .5 grams or more of cocaine (count 14), conspiracy to sell more than 26 grams of cocaine within 1,000 feet of a school (count 21) and conspiracy to deliver more than 26 grams of cocaine within 1,000 feet of a school (count 22).  The trial court merged counts 1 and 2, counts 3 and 4, counts 5 and 6, counts 7 and 8, counts 9 and 10, counts 11 and 12, counts 13 and 14, and counts 21 and 22.  Defendant Graham received twelve-year sentences for the resulting convictions in counts 1, 3, 7, 9, and 13.  He received a six-year sentence for count 11, and a 25-year sentence for count 21.  The trial court imposed concurrent sentences for counts 1, 3, 5, 11, 13, and 21 to be served consecutively to concurrent sentences in counts 7 and 9 for an effective 37-year sentence.  On appeal, Defendant Graham raises the following issues: (1) the trial court erred by denying Defendant Graham's motion for severance of offenses; (2) the trial court erred in denying Defendant Graham's motion for election of theories and/or bill of particulars; (3) the trial court erred in denying Defendant Graham's *Batson* challenge; (4) the trial court erred in denying Defendant Graham's request to determine the competency of the CI; (5) whether the evidence was sufficient beyond a reasonable doubt to support Defendant's Graham's conspiracy convictions; and (6) whether the trial court correctly sentenced Defendant Graham.  Defendant Murchison also filed an appeal which is addressed in a separate opinion of this court.  Following our review of the

parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

L. Dudley Senter, III, Bristol, Tennessee, for the Appellant, Garrick Graham.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Barry P. Staubus, District Attorney General; Lesley Foglia and Kent Chitwood, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### Background

At the time of the offenses in this case, Corporal Ray McQueen of the Kingsport Police Department was the director of the Second Judicial District Drug Task Force (DTF). He was contacted by John Dukes about working as a confidential informant (CI) in the investigation of Defendant Garrick Graham and Defendant Bashan Murchison. Mr. Dukes had previously been convicted of a drug crime in Virginia and spent three months in jail. Since he was enlisted in the United States Army at the time of the offense, Mr. Dukes also spent three months in confinement as a result of a court martial. Mr. Dukes had met Defendant Graham in 2010 at the home of Mr. Dukes' sister, Keanna Duke, located at 111 Broadview Avenue in Kingsport, Tennessee. Defendant Murchison also had a relationship with Mr. Dukes' other sister. In the Spring of 2011, Mr. Dukes was charged in Virginia with conspiracy to distribute cocaine. Drug agents in Virginia suggested that he contact agents in Tennessee about becoming a CI. Mr. Dukes was paid for working as an informant, and he was not made any promises by Corporal McQueen about his pending Virginia charges in exchange for working as a CI. Thereafter, Mr. Dukes arranged controlled crack cocaine buys that took place on September 1, 10, 15, and 26, 2011, and on October 12, 17, and 24, 2011, and finally on November 7, 2011. Defendant Graham was Mr. Dukes' contact for purchasing the cocaine.

Concerning the standard procedure for each of the controlled drug buys, Corporal McQueen testified: "Our deals are uniform. We try to make them all the same." He said that the CI would notify the DTF when there was an opportunity to buy drugs. A least two DTF agents would then meet the CI at a predetermined location, and the CI would make a recorded call to the "target." Once a controlled buy was arranged, the DTF

agents would search the CI and his vehicle for money, weapons, and narcotics. The CI would be given recording equipment and "buy money" to purchase the drugs. The controlled buy was then monitored by the agents. After the drug buy, the CI and DTF agents would meet at a predetermined location, and the agents would recover physical and recorded evidence, and a statement would be taken from the CI. The DTF agents would again search the CI and his vehicle. Corporal McQueen testified that the standard procedures were followed during each of the controlled buys involving Mr. Dukes and Defendants Graham and Murchison.

Mr. Dukes called Defendant Graham on September 1, 2011, to arrange the first drug buy. He met the DTF agents at the predetermined location and was given $1,000 to make the purchase. Mr. Dukes drove to his sister's house on Broadview Avenue, met Defendant Graham, and purchased twenty rocks of crack cocaine. Mr. Dukes noted that during the audio recording of the transaction, he attempted to negotiate a price for the drugs with Defendant Graham in order to build a "rapport" with him. Corporal McQueen and Mr. Dukes testified that there was no video of the buy because Mr. Dukes damaged the equipment when he dropped it. Agents observed Mr. Dukes walk into the house, and they monitored the audio of the transaction.

Agent Ashley Cummings, a forensic scientist with the Tennessee Bureau of Investigation (TBI) Chemistry Drug Identification Section, later performed chemical testing on a sample of the "rocklike substance" obtained during the controlled buy on September 1, 2011. The tested sample contained 1.46 grams of cocaine.

Mr. Dukes called Defendant Graham to arrange the second controlled buy which took place on September 10, 2011. Mr. Dukes met the agents and was given $1,300 to make the purchase. Mr. Dukes then drove to his sister's house on Broadview Avenue where he negotiated with Defendant Graham and purchased 34 rocks of cocaine for $1,250. Corporal McQueen testified that the equipment was again malfunctioning but there was an audio recording of the second drug buy. On the audio recording, Defendant Graham could be heard counting out thirty-four rocks of crack cocaine.

Agent Ashley Cummings of the TBI later tested the substance obtained during the controlled buy on September 10, 2011. The tested sample contained 1.98 grams of cocaine.

Mr. Dukes called Defendant Graham and arranged a third controlled buy on September 15, 2011. The transaction again took place at Ms. Dukes' house at 111 Broadview Avenue. This time the transaction was videotaped. Defendant Graham sold Defendant thirty-four rocks of crack cocaine for $1,250. During the meeting Defendant discussed another package of crack cocaine in his possession containing 600 rocks of

cocaine. Mr. Dukes testified that the package of cocaine was in a big bag and was "[m]uch bigger than the amount he had bought from Defendant Graham.

Agent Carl Smith, a forensic scientist with the TBI, performed a chemical analysis on the "rocklike substance" purchased on September 15, 2011. He tested samples from "several small corner bags" which he determined contained .71 grams of cocaine. The gross weight of the remaining substance was 14.16 grams.

Mr. Dukes arranged a fourth buy from Defendant Graham on September 26, 2011. The two "talk[ed] back and forth," and the discussions led to a meeting at the IHOP restaurant located on East Stone Drive in Kingsport. Agents followed Mr. Dukes to the restaurant and identified a blue/green Buick LaSabre known to be Defendant Graham's vehicle in the parking lot. Lieutenant Brad Tate of the Bristol Police Department, who was assigned to the Second Judicial District Task Force, testified that he saw Defendant Graham sitting at the table with Mr. Dukes in the restaurant. While there, Defendant Graham sold Mr. Dukes 58 rocks of cocaine for $2,300. After a short amount of time, Lieutenant Tate saw Mr. Dukes and Defendant Graham walk out of the restaurant and get into the Buick LaSabre.

Agent Jacob White, a forensic scientist with the TBI, performed chemical testing on a sample of the "rocklike substance" purchased on September 26, 2011. The substance was packaged in "58 knotted individual corner plastic bags." The substance in three of the bags tested positive for cocaine, and the total weight of the three bags was 1.01 grams. The gross weight of the other 55 bags, including the packaging, was 23.68 grams.

Mr. Dukes contacted Defendant Graham about a fifth controlled buy on October 12, 2011. Mr. Dukes met Defendant Graham at 111 Broadview Avenue. While there, Defendant Graham called Defendant Murchison on a cell phone because Defendant Graham did not have the full amount of crack cocaine that Mr. Dukes was trying to purchase. Mr. Dukes also spoke with Defendant Murchison over the phone about purchasing 21 grams of cocaine for $2,000. Mr. Dukes testified that he only had $1,800 in buy money, and Defendant Graham agreed to cover the remaining amount so that Defendant Murchison would not complain. At some point, Mr. Dukes and Defendant Graham left the house on Broadview and drove to a carwash on Lynn Garden Drive to meet Defendant Murchison. On the way, Mr. Dukes and Defendant Graham had a recorded conversation about "[g]oing to the source or cutting out the middle man."

When they arrived at the car wash, Mr. Dukes got into Defendant Murchison's vehicle, and Murchison's wife or fiancée, Teresa Holder, was also in the vehicle with him. Defendant Graham remained outside and washed Defendant Murchison's vehicle.

4

In a recorded conversation while in the vehicle, Defendant Murchison and Mr. Dukes discussed how $150 to $200 could be made by selling .5 grams of crack cocaine. Mr. Dukes testified that they also discussed: "[Y]ou know, I was making so much money, you know, pushing what he just gave me, that I should give him some money to - - - when he goes back to his source to get more to bring back more." Mr. Dukes also told Mr. Murchison that he thought Defendant Graham had been taking advantage of Mr. Dukes because there was a lot of "shake" in a couple of buys that Mr. Dukes had made from Mr. Graham. Mr. Dukes then paid Defendant Murchison $2,000 for crack cocaine.

Agent John Scott, a forensic scientist with the TBI, performed chemical testing on the sample of the "rocklike substance" purchased on October 12, 2011. The sample tested positive for crack cocaine. The total weight of the substance was 26.34 grams.

Mr. Dukes arranged for a sixth controlled buy with Defendant Graham on October 17, 2011. He spoke with Defendant Graham by phone, and they discussed Mr. Dukes purchasing 21 grams of cocaine for $2,000 which Mr. Dukes felt was too expensive. Mr. Dukes said, "I'm paying almost street value what a crack head would pay." Mr. Dukes then called Defendant Murchison to negotiate a price for the cocaine. Mr. Dukes spoke to Defendant Graham again, and Defendant Graham indicated that if Mr. Dukes "bought two ounces sitting at 24 grams [he would] only have to pay $1,800 a piece." They discussed that the two ounces would be purchased from Defendant Murchison. Mr. Dukes testified that the numbers given to him by Defendant Graham came from Defendant Murchison.

Mr. Dukes later met Defendant Murchison at the IGA parking lot located on West Sullivan Street, and Defendant Murchison got into the car with him. Corporal McQueen observed Murchison get into the vehicle. Defendant Murchison's wife or fiancée was in Murchison's vehicle. They had a discussion about 28 grams of cocaine, and whether Mr. Dukes had brought the correct amount of money. Mr. Dukes testified that he purchased crack cocaine from Defendant Murchison, and on the video of the transaction, Defendant Murchison could be heard counting the money that had been given to Mr. Dukes by the DTF. Officer Grady White of the Kingsport Police Department assisted the DTF on October 17, 2011. He followed a silver Subaru Outback for a short distance and then made a stop of the vehicle for changing lanes without using a signal. Defendant Murchison was driving the vehicle, and Teresa Holder was in the passenger seat.

Agent Sharon Norman, a forensic drug chemist with the TBI, performed chemical testing of the substance purchased on October 17, 2011. The substance tested positive for cocaine and weighed 20.93 grams.

Mr. Dukes arranged a seventh controlled buy with Defendant Graham, and they met at 111 Broadview Avenue on October 24, 2011. They discussed Defendant Murchison's cocaine prices and amounts. At Defendant Murchison's request, Mr. Dukes then drove to the Perfect Pair, a business located on Stone Drive and owned by Defendant Murchison and Teresa Holder. Defendant Graham arrived at the business after Mr. Dukes. Mr. Dukes then gave Defendant Murchison $1,950 to purchase crack cocaine, and Defendant Murchison gave the drugs to Defendant Graham. Mr. Dukes drove back to 111 Broadview Avenue, and Defendant Graham delivered the cocaine to him. Mr. Dukes noted that the cocaine appeared to be wet.

Agent David Holloway, a forensic drug chemist with the TBI, performed chemical testing on the substance purchased on October 24, 2011. The substance tested positive for cocaine and had a total weight of 25.31 grams.

Mr. Dukes arranged an eighth controlled buy on November 7, 2011. He initially called Defendant Graham, who did not answer. Mr. Dukes then spoke to Defendant Murchison. He later met Defendant Murchison at the Perfect Pair and purchased a one-half ounce "chunk" of crack cocaine for $1,000. Since Defendant Murchison did not have the full amount of drugs that Mr. Dukes had requested, Mr. Dukes called Defendant Graham and began negotiating another drug transaction in Defendant Murchison's presence. Defendant Graham offered to sell Mr. Dukes 22 rocks of cocaine for $1,700. Mr. Dukes testified that Defendant Murchison did not want anything that he (Defendant Murchison) said, during Mr. Dukes' conversation with Defendant Graham, relayed to Defendant Graham. Mr. Dukes told Murchison that Graham had 22 rocks for $1,700. Mr. Dukes then overheard Murchison talking on the phone to Defendant Graham. Later that day, Mr. Dukes drove to the carwash located at 525 Lynn Garden Drive. Defendant Murchison then arrived at the carwash and sold Mr. Dukes an additional 22 rocks of cocaine for $900. Mr. Dukes testified that he knew the 22 rocks of crack cocaine came from Defendant Graham because of the "way it looked." The 22 rocks that Mr. Dukes had purchased earlier from Graham were individually wrapped.

Agent Michael Bleakley, a forensic drug chemist with the TBI, tested the "rocklike substance" purchased on November 7, 2011. One "larger piece" of the substance weighed 6.62 grams and tested positive for cocaine. The substance in two "small corner bags" had a gross weight, including packaging, of 8.69 grams. Agent Bleakley testified that the total weight of the substance submitted was less than 26 grams.

Steven Starnes is the Geographic Information Systems (GIS) analyst and principle cartographer for the City of Kingsport. He is an expert in the fields of cartography and GIS analysis for the City of Kingsport. Mr. Starnes testified that he created "drug buffer" maps for use in the present case. The maps demonstrated that the IHOP Restaurant

6

located at 1201 East Stone Drive was within 1,000 feet of the Boys and Girls Club of Kingsport, which is a recreational center. The carwash located at 525 Lynn Garden Drive, where the controlled drug buy on October 12, 2011, occurred, is within 1,000 feet of the Andrew Jackson Elementary School. Another map prepared by Mr. Starnes demonstrated that the IGA store located at 433 West Sullivan Street is within 1,000 feet of the Play Center, which is a child daycare facility.

## Analysis

*I.*      *Denial of Motion to Sever Offenses*

Defendant Graham first argues that the trial court erred by denying his motion to sever the multiple drug offenses in this case. We disagree.

Rule 14(b) of the Tennessee Rules of Criminal Procedure provides in pertinent part:

(1) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

Also, Tennessee Rule of Criminal Procedure 8(b), provides that

[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:

(1) the offenses constitute parts of a common scheme or plan; or
(2) they are of the same or similar character.

A trial court's decision "to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) [Tennessee Rules of Criminal Procedure] are to be reviewed for an abuse of discretion." *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999). Our supreme court has explained that "when a defendant objects to a pre-trial consolidation motion by the state, the trial court must consider the motion by the severance provisions of Rule 14(b)(1), not the 'same or similar character' standard of Rule 8(b)." *Spicer v. State* 12 S.W.3d 438, 443 (Tenn. 2000). In reviewing the propriety of the consolidation of offenses prior to

7

trial, the reviewing court should look to the evidence presented at the severance hearing. *Id.* at 447.

Common scheme or plan evidence tends to fall into one of three categories: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. *Moore,* 6 S.W.3d at 240. "The larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993) (citing N. Cohen,*12 *Tennessee Law of Evidence*, § 404.11 (2nd ed.1990)). "The same transaction category involves crimes which occur within a single criminal episode." *Id.*

In examining a trial court's determination on a severance issue, the second prong of Rule 14(b)(1) requires a showing that the evidence of one offense would be admissible in the trial of the others if the offenses became severed. *Spicer*, 12 S.W.3d at 445. To comply with the requirements in the second prong, the trial court must conclude that (1) the evidence of an offense is relevant to some material issue in the trial of the other offense under Tennessee Rule of Evidence 404(b)(2); and (2) the probative value of the evidence of the other offense is not outweighed by the prejudicial consequences of admission under Tennessee Rule of Evidence 404(b)(4). *State v. Hoyt*, 928 S.W.2d 935, 944 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447 n. 12. In Tennessee, evidence of other offenses may be admissible to show (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; or (6) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other. *Id.*

The record reflects that the trial court in this case did not abuse its discretion by denying Defendant Graham's motion to sever offenses. Defendant Graham participated in each of the individual cocaine transactions in this case. His role in the related conspiracy with Defendant Murchison demonstrated a continuing scheme or plan to sell to Mr. Dukes, the CI, increasing quantities of crack cocaine. This court has held that multiple drug transactions can qualify as a common scheme or plane. *State v. Mosley*, No. 01C01-9211-CC-00345, 1993 WL 345542, at *4 (Tenn. Crim. App., Sept. 9, 1993)("[I]n the case at bar, four of the indicted offenses occurred within a three-day period and the other occurred approximately six weeks later. All of the offenses involved the same controlled substance, the same defendant, the same informant and the same witnesses. It was such a continuous episode so closely related that the proof was essentially the same in each case."); *State v. Joseph Clyde Beard, Jr*., No. 03C01-9502-CR-00044, 1996 WL 563893 (Tenn. Crim. App., Sept. 26, 1996)("[C]ommon scheme" found where same informant purchased similar amounts of cocaine from the same

defendant for the same amount of money in the same location although the drug transactions occurred a month apart); and *State v. Patrick L. Maliani*, No. M2012-01927-CCA-R3-CD, 2013 WL 3982156, at *12-13 (Tenn. Crim. App., Aug. 5, 2013)(The "two offenses were part of a continuing criminal scheme and also important to show the identity of the Defendant.").

All but one of the offenses in this case took place during a period of time from September 1, 2011, through October 24, 2011, and involved the same controlled substance, the same CI, and either Defendant Graham or Defendant Murchison or both. The offenses also involved the same area in Kingsport. Corporal McQueen testified that the standard procedure was the same for each of the buys, and the buys involved virtually the same sequence of events. We note that there is no requirement that "each incident be identical to the previous one." *State v. Roger D. Pulley*, No. 01C01-9501-CC-00013, 1995 WL 555060, at *2(Tenn. Crim. App., Sept. 20, 1995). In *Pulley*, a panel of this court found that severance was inappropriate when the five drug offenses "[o]ccurred within eight weeks of one another and involved virtually the same sequence of events, the same confidential informant, and the same established procedure." *Id.* at *2. While Defendant Murchison had varying degrees of involvement in the offenses, the evidence of his cooperation with Defendant Graham is sufficient to establish a larger continuing plan to supply Mr. Dukes with progressively greater quantities of crack cocaine, which the trial court described as a "criminal enterprise."

We further find that evidence of at least one offense in this case would be relevant to the trial of other offenses. Evidence of each individual drug sale is relevant in the conspiracy trial to establish Defendant Graham's plan with Defendant Murchison and the overt acts in furtherance of their agreement. Also, evidence of the conspiracy would be relevant in the trial for each individual sale to show motive, intent and guilty knowledge. As pointed out by the State, Defendant Graham's counsel raised during closing argument the issue of identity by noting the lack of video evidence for certain drug transactions. Defendant Graham also raised the possibility of mistake due to what he asserted was the CI's memory problems and unreliable DTF procedures. Therefore, evidence of the individual drug transactions would be relevant in the trial of other sales in order to establish identity and show an absence of mistake.

Finally, we find that Defendant Graham has not established that he was clearly prejudiced by the lack of severance and that the probative value of the evidence was outweighed by the prejudicial effect. On appeal, the denial of the severance will not be reversed unless it appears that the defendant was clearly prejudiced. *State v. Coleman*, 619 S.W.2d 112 (Tenn. 1981). The trial court in this case minimized the risk of prejudice by instructing the jury as follows:

The crime charged in each count is a separate and distinct offense. You must decide each charged offense for each defendant separately on the evidence and the law applicable to the charged offense and to each defendant. A defendant may be found guilty or not guilty of any or all of the offenses charged and included within each count, however, you can find a defendant guilty of only one offense in each count.

See *State v. Patrick L. Maliani*, No. M2012-01927-CCA-R3-CD, 2013 WL 3982156, at *12-13 (Tenn. Crim. App. Aug. 5, 2013). The jury is presumed to follow its instructions. *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001). Defendant is not entitled to relief on this issue.

## II.     *Election of Offenses*

Defendant Graham argues that the trial court erred by denying his "Motion for Election of Theories and/or Bill or [sic] Particulars." He asserts that the trial court violated his right to a unanimous verdict by failing to require the State to elect "the specific acts and offenses to support the general charge of conspiracy." We disagree.

Where there is evidence at trial that the defendant has committed multiple offenses during a time period alleged in a single count of an indictment or presentment, the doctrine of election requires the State to elect the facts upon which it is relying to establish a charged offense. *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). "The election requirement safeguards the defendant's stated constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Id*. at 631 (citing *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)).

Because the election requirement is "fundamental, immediately touching the constitutional rights of the accused," an election of offenses is mandated whether or not the defendant requests an election. *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Rather, it is incumbent upon the trial court even absent a request from the defendant to ensure that the State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993).

First, no election was required in this case. Conspiracy is a single offense even though the State alleged and proved multiple and discrete criminal acts committed in furtherance of the conspiracy. In *State v. Adams*, 24 S.W.3d 289 (Tenn. 2000), our supreme court set forth:

10

Continuing offenses generally stem from a single motivation or scheme, although such offenses can be committed by multiple discrete acts occurring over a period of time.  For example, in *State v. Hoxie*, 963 S.W.2d 737 (Tenn. 1998), we concluded that the offenses of stalking and telephone harassment were continuing offenses because the statutory language contemplated a series of discrete actions amounting to a continuing course of conduct.  *Id*. at 743.  In concluding that the offense punished a single continuing course of conduct, we stated that while the offenses involved numerous discrete parts, the defendant was not in danger of receiving a non-unanimous jury verdict.  *Id*. ("While we agree with the Court of Criminal Appeals that the unlawful actions which constitute the offense of stalking may in some instances be separate and distinct crimes, we conclude that when the only offense charged requires proof of a continuous course of conduct, the election requirement does not apply.").

Likewise, in *State v. Legg*, 9 S.W.3d 111 (Tenn. 1999), we concluded that the offense of kidnaping [sic] was a continuing offense based upon the language of the statute and the nature of the offense.  We analyzed the statutory elements of "removal" and "confinement" and noted that the very nature of removal or confinement did not lend itself to division into segments of time with various points of termination.  Furthermore, we stated that "an act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime at every moment the victim's liberty is taken."  *Id.* at 117.  Because the terms "removal" and "confinement" contemplated a continued state of being restrained, we held that the General Assembly must have intended to punish a continuing course of conduct by using those terms.

Although the appellants in this case argue that child abuse through neglect may "be seen as multiple occasions of neglect, each of which results in serious bodily injury," these cases illustrate that a continuing offense may be composed of multiple discrete acts where a single scheme or motivation is present.  Nevertheless, we have previously stated that we will find that an offense punishes a continuing course of conduct "only when 'the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that  [the legislature] must assuredly have intended that it be treated as a continuing one.'"  Id. at 116 (quoting *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed2d 156 (1970)).  In deciding whether an offense is a continuing one, therefore, this Court will look to

the statutory elements of the offense and determine whether the elements of the crime themselves contemplate punishment of a continuing course of conduct. *See id.*

*Adams*, 24 S.W.3d at 294-95.

This court has specifically held:

Criminal conspiracy is a single offense, and the statute provides that although a person may conspire to commit a number of offenses, he or she is guilty of only one conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship. T.C.A. §39-12-103(c). By contrast, the legislature intended the manufacture, delivery, sale, and possession of controlled substances to be separate substantive offenses. See T.C.A. § 39-17-417, Sentencing Commission Comments.

In this case, the indictment specifies the date of each individual offense, including dates for each overt act alleged within the conspiracy counts. The evidence at trial was also precise as to the date of each controlled buy. The State did not prove more crimes than were charged. The State alleged several overt acts in support of the two alternative conspiracy counts in counts 21 and 22, and the jury unanimously found Defendant Graham guilty of each of the separately charges offenses or one of the lesser-included offenses. Therefore, it was unnecessary for the State to elect any particular overt act for the continuing offense of conspiracy to sell or deliver more than 26 grams of cocaine within 1,000 feet of a school. Defendant is not entitled to relief on this issue.

## III. *Batson Challenge*

Relying on *Batson v. Kentucky, 476 U.S. 79 (1986)*, Defendant argues that the exclusion of the only African-American member of the venire from the jury violated his constitutional right to equal protection under the law. We disagree.

The record establishes that Defendant is African-American. At the beginning of the voir dire, the following exchange took place:

THE COURT:               All right, Ms. Skaggs, are you okay today?

MS[.] SKAGGS:            I have an infection in my eye.

THE COURT:                              Okay, are you okay to be able to serve on a jury or are you under medical treatment?

MS[.] SKAGGS:                          I just finished dealing with - - - trying to figure out what it is.  I just got my stitches out.

THE COURT:                              Can the attorneys approach here just a second?

*      *      *

THE COURT:                              She doesn't look particularly good.

[PROSECUTOR]:                        And she appears to have been asleep back there.

THE COURT:                              Probably more health issues.  I mean I think we ought to excuse her.  She's got an infection.  I don't know if it's catching or - - - I don't want the other jurors to be alarmed by that.  Do you have any problem with that?  I mean she's the only African [-] American  - - -

[GRAHAM'S COUNSEL]:      Which leads me to the - - what I will bring to the Court's attention after we set the jury or whatever, but - - -

THE COURT:                              I mean she's the only African [-] American and I'm not trying to use it for that reason but - - -

[PROSECUTOR]:                        We had meant to cause to strike her anyway.  She wasn't here when - - she was late today.  She appears to have been asleep - - -

THE COURT:                              I can put her under oath - - -

[GRAHAM"S COUNSEL]:      Because of - - - I'm not - - -

THE COURT:                              Well, the Court is concerned about her medical situation but on the other hand if you want me to inquire [further] I can ask the rest of the jury to step out and we can talk to her individually.

13

[GRAHAM"S COUNSEL]: Judge, in the long run if the Court would be kind enough to do that.

THE COURT: Okay, I'll bring her up. Ms[.] Skaggs, can you come up here just for a second. I need to ask you to raise your right hand because you weren't in here this morning when I put people under oath - - -

MS[.] SKAGGS: No, sir.

THE COURT: - - -for jury selection so if you'll raise your right hand. Do you solemnly swear or affirm that you will answer truthfully all quest[i]ons touching upon your competency to serve as a juror in this case.

MS[.] SKAGGS: Yes, sir.

THE COURT: All right, now I can see obviously your eye is swollen a great deal. Are you under the care of a doctor?

MS[.] SKAGGS: Uh-huh (affirmative).

THE COURT: When did - - - did you have an operation?

MS[.] SKAGGS: I had a biopsy and I said the wrong word. It's inflammation. It's a mass of inflammation. It's not an infection.

THE COURT: All right, when did you have your surgery?

MS[.] SKAGGS: On the 10th.

THE COURT: The 10th? Okay, so that was last Wednesday?

MS[.] SKAGGS: Uh-huh (affirmative), and I had the stitches removed today.

THE COURT: Okay, are you still - - - are you in pain?

14

MS[.] SKAGGS:                    No, it don't [sic] even hurt.

THE COURT:                 Well, I'm just asking.  Okay, so you don't have an infection then?

MS[.] SKAGGS:                    No, it's inflammation.

THE COURT:                 Are you off work or do you work?

MS[.] SKAGGS:                    No, I go every night.

THE COURT:                 Okay, where are you working?

MS[.] SKAGGS:                    FedEx.

THE COURT:                 Okay, well I guess one of the questions I ask is, again you said infection but you say it's not an infection.

MS[.] SKAGGS:                    That's right, I said it wrong.  I'm sorry.

THE COURT:                 No, no, there is a little bit of a difference.

MS[.] SKAGGS:                    Yeah.

THE COURT:                 Do you feel that you would be able to serve as a juror in this case?

MS[.] SKAGGS:                    I do[n]'t see why not.

THE COURT:                 Okay, now have you heard me as I've talked a little about this case.  You came in a little bit late.  I know you weren't here when I called - - -

MS[.] SKAGGS:                    No, I - - -

THE COURT:                 Have you heard me as I've introduced these individuals?

MS[.] SKAGGS:                    Yes.

15

Ms. Skaggs indicated that she did not know Defendant Graham or Defendant Murchison or any of the other individuals involved in the case. The prosecutor then asked if Ms. Skaggs was able to see okay because the case involved "a lot of video" evidence. Ms. Skaggs responded: "That might be kind of - - you know, I suppose just a little problem. If I have to read or something like that." She indicated that she could see out of one eye and that she only wore reading glasses. The court then conducted a jury-out hearing regarding the State's request to excuse Ms. Skaggs as a juror. Defense counsel for Defendant Graham objected to the State's request to strike Ms. Skaggs noting that she was the only African-American on the venire.

In the jury-out hearing, the prosecutor stated the following reason for excluding Ms. Skaggs as a juror:

> Judge, and I think from my observation today, number one she was late to court; one, maybe two individuals out of the entire venire that was late. Number two, based on my observation as an officer of the court she appeared to be asleep. Now, I know she's got a problem with one of her eyes but appeared to have both eyes closed during - - - every time I'd look back Judge. Now, she testified she had stitches out today. Based again on my observation, there's something green seeping out of her eye and it's swollen quite a bit. When asked at the bench whether she'd have trouble reading she said that she might have trouble reading. Based on all those reasons, Judge, that's why we would strike her.

The co-prosecutor also said:

> And I would just add that when we were up at the bench and you were asking what other jurors were left and who was here to be a juror on the case there were several individuals that raised their hand. She didn't. She seemed completely out of it. She obviously wasn't paying attention and, you know, can't follow instructions.

The trial court then noted that Ms. Skaggs only showed up for court after someone from the clerk's office called her.

The following exchange then took place:

[GRAHAM'S COUNSEL]: I would like to say that the State's excuse is pre-textual and inadequate. General Chitwood

16

indicates that at our bench conference that he was concerned about her eyesight yet if I am - - - I may be mistaken at this late moment, we have a juror who complained early on that she had motion sickness and if I'm not mistaken that's juror number 4 and she's still on the panel so we have someone with some concern about her being able to see. She said she may close her eyes but she can always listen to the audio. That[] was what was discussed at the bench. The same thing can apply to the juror in question now. Also, General Chitwood commented that she came in late. Judge, again, at this late date I may very well be confused but if I'm not mistaken juror number 10, who we just sat, also came in late because you had to swear her but yet she made the box. I would say that consequently those two excuses are inadequate because we have jurors. The juror in question states at [the] bench that she sees without glasses, she can see out of one of her eye[s]. Mr. Chitwood indicates that he saw her with her eyes shut. I don't know that that's any indication that she was asleep. Certainly that would have been a question to her. I have no knowledge of that. She answered, came up and seems quite lively and I don't see why she needs to be struck and, Your Honor, [Defendant Murchison's counsel] joined into my objection.

* * *

[MURCHISON'S COUNSEL]: Your Honor, I have very little to add other than to say that it was apparent to me that Ms[.] Skaggs was in complete control of her faculties at the bench conference. She answered your questions promptly and clearly and thoughtfully and intelligently.

* * *

[PROSECUTOR]: Number one, Judge, I don't think the defense counsel touched on this, [co-prosecutor's] point when you asked the individuals in the audience who were potential jurors it was my understanding she did not raise her hands like the others did. She sat there, either did not understand and I think you asked - - - you had to ask it twice and then she still did not raise her hand but the other individuals did. The Court I think can take judicial notice of that fact, that she either did not understand your question, could not hear your question or was not paying attention or whatever reason, was the only one of the potential jurors who was nonresponsive to that. Secondly, the individual who allegedly has motion sickness, I have asked her twice in voir dire about that extensively and she said that she could watch it and if it

17

became a problem she'd raise her hand and I still have concerns about it, however, I mean that's what they are, concerns, but that's different than someone who physically will not be able to read, which is what she stated at the bench. She's going to have trouble reading is what this juror stated and again, while she was late and another juror was late if that was all that would not be the reason we were striking her, it's the totality of it. She was late. She was nonresponsive to your questions. She says she'd have trouble reading and I think the Court could take judicial notice of this, she has a swollen eye. She said she just had her stitches removed today and something is seeping from her eye and based on all of that, Judge, I would strike any juror who looked like that on the day of trial.

THE COURT:                All right, well let me just state a few things for the record. First of all I did call Ms. Skaggs in the first group of 18. She was not here when I called her name and I gave it to the clerks and the clerks informed me that they contacted her and so she appeared later. The other individual I remember specifically coming in during the early stages when the first 18 were in the box and she was just a few minutes later but for just the record I mean I'm in a position of observing that. The other thing that I would state too for the record, certainly I think - - - as I said a moment ago, Ms[.] Skaggs is the only African[-] American that I saw in the venire and of course both Mr. Graham and Mr. Murchison are both African[-] American so I do note that for the record as well. Now, the State has indicated that she was late. I mean I think it's clear from looking at the witness that her right eye, in fact that was what alerted me to ask questions, call her up individually, was her right eye is essentially swollen shut. I mean it's very puffy and I think both counsel for the defense would agree with that, would you not, [Graham's counsel]?

[GRAHAM'S COUNSEL]:      Yes, Judge, it appears puffy to me.

THE COURT:                And almost to the point where it's closed shut.

[GRAHAM'S COUNSEL]:      I saw that, Judge, yes.

THE COURT:                I mean obviously there's no picture that we have here but I mean I want to make sure that I'm not seeing something that the attorneys are not seeing as well. The State has

18

indicated that she was later, had to be called in. Their observations of her while she was in court was that she appeared to be asleep, that she did not respond and I think that was clear and the Court observed that as well when I was asking questions about the remainder of the panel and she didn't appear to acknowledge that she was a juror until after I'd asked at least twice; maybe three times. I maybe even called her name to double check. Also, she has indicated that she - - - I asked her if she might have any problems serving and she said she may have trouble seeing; again that's something that she personally acknowledged. Now, I inquired further about glasses and other things but that was a statement that she had made. In my opinion the State has set out what I consider to be a clear reasonably specific and a challenge reasonably related to a particular case to be tried. I mean this is a case that's going to involve lots of witnesses. It's going to go for several days. I mean it's not just a one day case but at least for another five days; also the fact that there's going to be a lot of video because we've already talked about that that will be involved in this case and in my opinion the defense [sic] has established what I consider to be a neutral reason for that and of course - - -

\*     \*     \*

THE COURT:          The State, excuse me, the State has established a neutral reason. Now, I will point out, too, that I mean while I certainly acknowledge what [Graham's Counsel] said that in a sense because you strike the only African [-] American on the panel that in turn it establishes a prima facie or at least an inference that there is discrimination that's occurred, other than that I've not seen anything else raised with regard to the way the State has proceeded in this case or otherwise that would seem to indicate that the State had a discriminatory intent in striking an African [-] American[] from the panel.

In *Batson,* the United States Supreme Court held that a state's use of peremptory challenges to intentionally exclude potential jurors of the defendant's race violates the defendant's right to equal protection. *Batson,* 476 U.S. at 89; 106 S.Ct. at 1719. "A criminal defendant may object to a race-based exclusion of a juror, effected through peremptory challenges, regardless of whether the defendant and the excluded juror share the same race." *State v. Carroll,* 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000) (citing *Powers v. Ohio,* 499 U.S. 400, 415-16, 111 S.Ct. 1364, 1373-74, 113 L.Ed.2d 411 (1991)).

19

The procedure for invoking a *Batson* challenge was discussed in *Carroll* as follows:

> *Batson* provides a three step process for the evaluation of racial discrimination claims in jury selection. First the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. *Puckett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71, 131 L.Ed.2d 834 (1995); *Batson,* 476 U.S. at 96-98, 106 S.Ct. 1712, 1722-24. If the defendant satisfies this initial burden, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. *Puckett,* 514 U.S. at 767, 115 S.Ct. 1770-71; *Batson,* 476 U.S. at 94, 106 S.Ct. 1712, 1721. Third, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination.
>
> *Batson,* 476 U.S. at 97-98, 106 S.Ct. 1712, 1723-24; *Hernandez v. New York,* 500 U.S. 352, 358-59, 111 S.Ct. 1859, 1865-66, 114 L.Ed.2d 395 (1991). In making its determination of whether use of a peremptory challenge was discriminatory, the trial court must articulate specific reasons for each of its findings. *Woodson* [*v. Porter Brown Limestone Co.*], 916 S.W.2d [896,] 906 [Tenn. 1996]. The trial court's findings are imperative for rarely will a trial record alone provide a legitimate basis from which to substitute an appellate court's opinion for that of the trial court. Thus, on appeal, the trial court's finding that the State excused a venire member for race-neutral reasons will not be reversed unless it is clearly erroneous. *See Woodson,* 916 S.W.2d at 906 (citations omitted).

{ "pageset": "Sa5f0 *Carroll,* 34 S.W.3d at 319-20.

As the United States Supreme Court observed in *Hernandez v. New York,* "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges [without prompting] and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez,* 500 U.S. at 359, 111 S.Ct. at 1866. The issue in the second step of the *Batson* process rests upon "the facial validity of the prosecutor's explanation." *Id.* at 360, 111 S.Ct. at 1866. "A neutral explanation . . . means an explanation based on something other than the race of the juror." *Id.* "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* In the second phase of the inquiry, the prosecutor's

20

explanation is not required to be "persuasive or even plausible." *Puckett,* 514 U.S. at 768, 115 S.Ct. at 1771.

In the case *sub judice,* the prosecutor offered several explanations for the challenge. First, the prosecutor, along with the trial court, noted that Ms. Skaggs was late to court. The trial court had observed that Ms. Skaggs did not show up to court until someone from the clerk's office called her. Second, the prosecutor pointed out that Ms. Skaggs appeared to be asleep during voir dire. Third, the prosecutor noted that Ms. Skaggs had stitches removed from her eye before court, and there was something green seeping out of her eye, which was swollen. Ms. Skaggs had also indicated that she might have trouble reading due to her eye-related problems. The co-prosecutor also pointed out that when the trial court asked what other jurors were left, and who was there to be a juror, Ms. Skaggs did not raise her hand, and she "seemed completely out of it," that she obviously was not paying attention, and "can't follow directions."

{ "pageset": "Sa5f0 The determination of a discriminatory intent on the part of the prosecutor "largely will turn on evaluation of credibility." *Baston,* 476 U.S. at 98 n.21, 106 S.Ct. at 1724 n.21. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez,* 500 U.S. at 365, 111 S.Ct. at 1869.

We conclude that the prosecutor's basis for the use of a peremptory challenge against Ms. Skaggs was sufficiently race-neutral to withstand a *Batson* challenge. The trial court accepted this racial neutral reason for exercising a peremptory challenge. Determination of a discriminatory intent depended largely on the evaluation of the prosecutor's credibility in this case. Defendant Murchison has not shown that the trial court erred in accrediting the State's racially neutral explanation for excusing the prospective juror. Defendant is not entitled to relief on this issue.

IV.    *Competency of the Confidential Informant to Testify*

Defendant Graham argues that the trial court erred by failing to determine the competency of Mr. Dukes, the CI, to testify. However, we find that the trial court did not abuse its discretion concerning this issue.

Rule 601 of the Tennessee Rules of Evidence provide that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute." "Virtually all witnesses may be permitted to testify: children, mentally

21

incompetent persons, convicted felons." Tenn. R. Evid. 601, Advisory Commission Comment. Rule 603 of the Tennessee Rules of Evidence provides that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." A party may attempt to impeach a witness by demonstrating his or her impaired capacity either at the time of the occurrence which is the subject of the testimony or at the time of the testimony. Tenn. R. Evid. 617; *State v. Barnes*, 703 S.W.2d 611, 617-18 (Tenn. 1985). "The question of witness competency is a matter for the trial court's discretion, and the trial court's decision will not be overturned absent an abuse of that discretion." *State v. Nash*, 294 S.W.3d 541, 548 (Tenn. 2009)(citing *State v. Caughron*, 855 S.W.2d 526, 538 (Tenn. 1993)).

In this case Mr. Dukes was presumed to be a competent witness. He was "duly sworn" and met all of the requirements to testify. During Mr. Dukes' direct examination, defense counsel for Defendants Graham and Murchison requested that the trial court voir dire Mr. Dukes out of the presence of the jury "with regard to whether the witness is on drugs or alcohol." The following exchange took place:

THE COURT: No, I'm not going to do that.

[Graham's Counsel]: Thank you, your honor. It just has been brought to our attention that he's thick-tongued and slow in response.

THE COURT: I mean a witness is, is what a witness is, and there's no basis for me to make inquiry about that.

We agree with the trial court. There is nothing in the record to indicate that Mr. Dukes was incompetent or too intoxicated to testify at trial, and he was presumed competent to testify. Both Defendant Graham and Defendant Murchison had opportunity during cross-examination to attempt to impeach Mr. Duke by demonstrating any alleged incapacity to testify. Neither defense counsel questioned Mr. Dukes about whether he was under the influence of drugs or alcohol at the time of his testimony. He was merely asked about his past drug and alcohol use. We note that in his closing statement, counsel for Defendant Graham said:

Mr. Dukes struggled with what happened. Mr. Dukes struggles with the truth of his life whether he was or wasn't consuming alcohol. I think Mr. Dukes had a hard time remembering. Lastly Mr. Dukes, his closing comments was he reminded us that he would do absolutely anything to stay out of jail and its my suggestion he did.

22

Although Mr. Dukes could not remember some details of the transactions, and his memory was refreshed during his testimony with his previous statements, this does not preclude him from being a competent witness. His inability to remember certain details does not address Mr. Duke's competency to testify but goes to the weight and value of his testimony, which is reserved for resolution by the trier of fact. "So long as a witness is of sufficient capacity to understand the obligation of an oath or affirmation, and some rule does not provide otherwise, the witness is competent." *State v. Caughron*, 855 S.W.2d 526, 538 (Tenn. 1993); *Johnnie W. Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at *9 (Tenn. Crim. App. Feb. 16, 2006). This issue is without merit.

## V.      *Sufficiency of the Evidence*

Defendant Graham contends that the evidence was insufficient to support his convictions for conspiracy to sell more than 26 grams of cocaine within 1,000 feet of a school (Count 21) and conspiracy to deliver more than 26 grams of cocaine within 1,000 feet of a school. He does not challenge the sufficiency of evidence for his remaining convictions. We find that the evidence is sufficient beyond a reasonable doubt to support the convictions.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia, 443* U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. *Id.* Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and

23

'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *State v. Marable*, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Conspiracy requires that "two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." T.C.A. § 39-12-103(a). Some overt act in the pursuance of the conspiracy must be proved to have been done by the defendant or another member of the conspiracy. Id. § 39-12-103(d); *State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999).

To prove the existence of a conspiratorial relationship, the State may show that a "mutual implied understanding" existed between the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). A formal agreement is not necessary. *Id.* The conspiracy may be demonstrated by circumstantial evidence and the conduct of the parties while undertaking the illegal activity. *Id.* "'Conspiracy implies concert of design and not participation in every detail of execution.'" *Id*. (quoting *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

The sale of a controlled substance includes the following elements: (1) that the defendant sold a controlled substance; and (2) that the defendant acted knowingly. T.C.A. § 39-17-417(a). "Sale" is a bargained-for offer and acceptance and an actual or constructive transfer or delivery of the controlled substance. *See State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). The delivery of a controlled substance includes the following elements: (1) that the defendant delivered a controlled substance; and (2) that the defendant acted knowingly. T.C.A. §39-17-417(a). "Delivery" means the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship. T.C.A. § 39-17-402(6). A "controlled substance" includes any drug, substance, or immediate precursor in Schedules I through VIII of T.C.A. § 39-17-403 to T.C.A. § 39-17-416. See T.C.A. § 39-17-402(4). Crack cocaine is a Schedule II controlled substance. T.C.A. § 39-17-408(a), (b)(4). A person acts knowingly with respect to certain conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. T.C.A. § 39-11-302(b). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.*

24

In this case, the evidence viewed in a light most favorable to the State establishes that Defendant Graham and Defendant Murchison conspired to sell or deliver more than 26 grams of cocaine within 1,000 feet of a school zone. Defendant Graham asserts that there was no "proof of any agreement between himself and co-defendant Bashan Murchison to sell cocaine within 1,000 feet of a school zone." However, as stated above no formal agreement is necessary, and the State may show than a "mutual implied understanding" existed between the parties. Also, participation in every detail of the execution of the conspiracy is not necessary.

Defendant Graham sold Mr. Dukes crack cocaine on September 1, 10, 15, and 26, 2011. He also introduced Defendant Murchison to Mr. Dukes as a drug supplier. When Mr. Dukes contacted Defendant Graham about a fifth buy on October 12, 2011, Defendant Graham did not have the full amount of cocaine that Mr. Dukes requested. Defendant Graham then contacted Defendant Murchison to arrange a transaction between Defendant Murchison and Mr. Dukes. Mr. Dukes spoke with Defendant Murchison over the phone about purchasing 21 grams of cocaine for $2,000. Mr. Dukes only had $1,800 for the purchase, and Defendant Graham agreed to cover the rest. Mr. Dukes and Defendant Graham then left the house on Broadview Avenue where they had met and drove to a carwash on Lynn Garden Drive to meet Defendant Murchison. The car wash is located within 1,000 feet of Andrew Jackson Elementary School. While at the carwash, Mr. Dukes got into the vehicle with Defendant Murchison and gave him $2,000 for crack cocaine. Defendant Graham waited outside during the transaction and washed Defendant Murchison's vehicle. Agent Scott testified that the total weight of the crack cocaine purchased on October 12, 2011, was 26.34 grams.

On October 17, 2011, Mr. Dukes arranged for a sixth controlled drug buy. He spoke with Defendant Graham by phone about purchasing 21 grams of crack cocaine for $2,000, which Mr. Dukes felt was too expensive. Mr. Dukes then called Defendant Murchison to negotiate a price for the cocaine. Mr. Dukes spoke to Defendant Graham again and Graham indicated that if Mr. Dukes "bought two ounces sitting at 24 grams [Mr. Dukes would] only have to pay $1,800 a piece." Defendant Graham and Mr. Dukes also discussed that the two ounces would be purchased from Defendant Murchison. Mr. Dukes specifically testified that the numbers given to him by Defendant Graham came from Defendant Murchison. Mr. Dukes later met Defendant Murchison at the IGA parking lot on West Sullivan Street, and Defendant Murchison got into the car with Mr. Dukes and sold him crack cocaine. Agent Norman testified that the cocaine purchased weighed 20.93 grams.

A seventh controlled buy was arranged between Defendant Graham and Mr. Dukes on October 24, 2011. The two discussed Defendant Murchison's cocaine prices

25

and amounts, and at Defendant Murchison's request, Mr. Dukes drove to the Perfect Pair, a business owned by Defendant Murchison. Defendant Graham arrived at the business after Mr. Dukes. Mr. Dukes then gave Defendant Murchison $1,950 in exchange for crack cocaine. Defendant Murchison gave the cocaine to Defendant Graham who later delivered it to Mr. Dukes at the house on Broadview Avenue. Agent Holloway testified that the cocaine purchased on October 24, 2011, weighed 25.31 grams.

A final buy took place on November 7, 2011. Mr. Dukes first called Defendant Graham who did not answer his phone. Mr. Dukes then spoke with Defendant Murchsion, and he later met Defendant Murchison again at the Perfect Pair. Mr. Dukes purchased a one-half ounce "chunk" of crack cocaine for $1,000. Since Defendant Murchison did not have the full amount of crack cocaine that Mr. Dukes wanted to buy, Mr. Dukes called Defendant Graham and negotiated another drug transaction in Defendant Murchison's presence. Defendant Graham offered to sell Defendant Murchison 22 rocks of crack cocaine for $1,700. Mr. Dukes then overheard Defendant Murchsion talking to Defendant Graham. Mr. Dukes later drove to the carwash on Lynn Garden Drive and met Defendant Murchison. He sold Mr. Dukes an additional 22 rocks of cocaine for $900. Mr. Dukes testified that he knew the rocks of cocaine came from Defendant Graham due to the "way it looked." He noted that the 22 rocks that Mr. Dukes had purchased from Defendant Graham were individually wrapped. Agent Bleakley testified that the "larger piece" of the substance purchased on November 7, 2011, weighed 6.62 grams and tested positive for cocaine. The substance in two "small corner bags" had a gross weight, including packaging, of 8.69 grams.

Defendant Graham relies on *State v. James Simonton*, No. E2006-01529-CCA-R3-CD, 2007 WL 3379791 (Tenn. Crim. App. Nov. 15, 2007) in support of his argument that the evidence was insufficient to support his conspiracy convictions. However, the defendant in *Simonton* never possessed any drugs or took an active part in the purchase, sale or delivery of cocaine. Nor did he communicate with anyone regarding the sale or delivery of drugs. This court held that the "facts simply do not establish a 'mutual implied understanding'" between the Appellant and his alleged co-conspirators to sell crack cocaine." *Id*. at *8. In the present case, Defendant Graham personally sold cocaine to Mr. Dukes on several occasions, and he communicated with Defendant Murchison about selling cocaine to Mr. Dukes. He was also present for the buy between Mr. Dukes and Defendant Murchison at the carwash on October 12, 2011. Defendant Graham discussed Defendant Murchison's drug prices with Mr. Dukes, and he essentially acted as a drug courier between Defendant Murchison and Mr. Dukes.

Defendant Graham also suggests that his conspiracy convictions are insufficient because the State relied solely on the uncorroborated testimony of Mr. Dukes whom he claims is an accomplice to the offenses. First, we note that the conspiracy convictions

26

did not rest solely on the uncorroborated testimony of Mr. Dukes. There was testimony by officers involved in the buys and recordings of the communications between Mr. Dukes, Defendant Graham, and Defendant Murchison to establish the conspiracy. There was also evidence of the actual crack cocaine that was purchased by Mr. Dukes from Defendant Graham and Defendant Murchison which was tested by TBI forensic chemists. In any event, Mr. Dukes does not qualify as an accomplice or one who could have been indicted for conspiracy to sell or deliver cocaine within 1,000 feet of a school. *See Brown v. State*, 557 S.W.2d 926 (Tenn. Crim. App. 1977)("[A] purchaser is not an accomplice of the seller, not being chargeable with the same offense."). This court has specifically held that a confidential informant is not an accomplice. Therefore, their testimony requires no corroboration. *See State v. Steve Edward Houston*, No. 01C01-9606-CC-00280, 1997 WL 351139, at \*1 (Tenn. Crim. App. June 26, 1997); and *State v. Cynthia Diane Southall*, No. 01C01-9304-CR-00143, at \*2 (Tenn. Crim. App. March 14, 1995).

The evidence is sufficient to support Defendant Graham's convictions for conspiracy. Defendant is not entitled to relief on this issue.

## VI.    *Sentencing*

Defendant challenges both the length of his sentences and the trial court's order of consecutive sentencing.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* Tenn. Code Ann. §§ 40-35-102, -103, -210; *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

27

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are *advisory only*. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select *any sentence within the applicable range* so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343 (*emphasis added*). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

The applicable sentencing range for a Range I offender convicted of: a Class A felony is 15 to 25 years; a Class B felony is 8 to 12 years; and a Class C felony is 3 to 6 years. T.C.A. § 40-35-112(a)(1)-(3). The trial court imposed the highest sentence within each range for each of Defendant's convictions.

The trial court stated on the record its findings regarding applicable enhancement and mitigating factors. The trial court found three enhancement factors applicable to Defendant Graham: (1) that the defendant has a previous history of criminal convictions or behavior, in addition to those necessary to establish the appropriate range; (2) that the defendant was a leader in the commission of an offense involving two (2) or more criminal actors; and (3) that the defendant had no hesitation about committing a crime when the risk to human life was high. T.C.A. § 40-35-114 (1), (2), and (10).

In *Bise* our supreme court held:

We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court *wholly departed* from the 1989 Act, as amended in 2005. SO

28

> long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*, 380 S.W.3d at 706 (*emphasis added*). In its conclusion, the supreme court pointed out that in sentences involving misapplication of enhancement factors (even in those cases where *no* enhancement factor actually applies) the sentences must still be affirmed if the sentences imposed are within the appropriate range, and the sentences are in compliance with statutory sentencing purposes and principles. *Id*. at 710.

Our General Assembly has enacted twenty-five (25) statutory sentencing enhancement factors; however, they are not binding upon the trial courts. T.C.A. § 40-35-114 (Supp. 2015). The standard of review established in *Bise* provides that the minimum sentence can be imposed even if the trial court correctly applies all twenty-five enhancement factors, or the maximum sentence imposed even if no statutory enhancement factors are applicable, as long as the sentence is within the correct range and the sentence complies with other sentencing purposes and principles. Accordingly, appellate review of enhancement factor issues is mostly unnecessary when reviewing the length of a sentence.

Having reviewed the record before us, we conclude that the trial court clearly stated on the record its reasons for the sentences imposed, and all of Defendant's sentences are within the appropriate ranges. The record reflects that the trial court considered the purposes and principles of the Sentencing Act. Therefore, the trial court's imposition of the maximum sentences is presumed reasonable.

Our supreme court has also extended the standard of review enunciated in *State v. Bise*, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). Tennessee Code Annotated section 40-35-115 sets forth the factors that are relevant in determining whether sentences should run concurrently or consecutively. The trial court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the seven statutory factors exist. *Id*. § -115(b). Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1). The length of the resulting sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;
or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b).

In *Pollard*, the court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." 432 S.W.3d at 862. "So long as a trial court properly articulates its reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.*; *Bise*, 380 S.W.3d at 705.

In this case, the trial court found two statutory factors, either of which alone would be sufficient to support the imposition of consecutive sentencing. The trial court found that Defendant was a professional criminal who has knowingly devoted his life to

criminal acts as a major source of livelihood and that Defendant was an offender whose record of criminal activity is extensive. With regard to the court's finding that Defendant was a professional criminal, the trial court found:

> I base that on a couple of factors. At least during the time period that this was occurring, his statement that he's filed with the presentence report indicates that he was doing what he could to take care of his family. Based on his mother's testimony here is he was working in law [sic] care of course that wouldn't be what he was doing during that point in time. There's no indication in the presentence report that that's what he was doing during the time period that this occurred and we're not just talking about a little amount of cocaine. I mean we're talking about a significant amounts of money involved. The evidence that I heard at trial, looking at the presentence report, starting out at $1,000, nine days later 12-50, five days later 12-70, eleven days later 2300, sixteen days later another $1950.00. Now this is with just the CI, just the ones that the State was involved with. I find it very hard to believe that the only time that he sold and/or delivered cocaine was during the time - - - was only to the CI. Anyway, but even just looking at the CI, I mean he was doing it and I think all this seems to show to me that he was doing it on a regular basis and he was doing it as the substantial means of livelihood to himself. I mean he may have only been making $200.00 every transaction. He may have had to borrow money still from his mother but that doesn't mean that he wasn't using it as a - - - I mean he moved to Tennessee to go into business and I agree with what the State said. I mean he went into business so I do find that one.

Concerning the finding that Defendant was an offender whose record of criminal activity is extensive, the trial court further found:

> . . . criminal activity doesn't just have to be the one prior conviction. It can be in this series of incidents that we're talking about here. And again, we're not talking about little amounts of cocaine. I mean these offenses are .5 grams or more but I mean if you look at the amounts involved in this case, I mean 20 grams, 25 grams, 24 grams, 26 grams, 9 grams, I mean we're talking about significant amounts of cocaine that was being delivered and/or sold or facilitated by this defendant. We're talking about seven separate incidents and so I find by a preponderance of the evidence that he has an extensive record of criminal activity. I mean seven separate incidents in a period of time involving less than two months so I find that and as a result of that I find that consecutive

31

sentencing is appropriate and I find, too, that it's frankly reasonably related to the severity of the offenses that have been committed. Cocaine is, the sale and use of cocaine is a scourge on our communities and the children in our communities and the adults in our communities so I find, again, that it's reasonably related to what occurred.

The record supports the trial court's findings. Defendant's employment history is somewhat sporadic and does not negate the finding of this factor *See State v. Gregory Davis*, No. W1999-02113-CCA-R3-CD, 2000 WL 298746, at \*7 (Tenn. Crim. App., Mar. 15, 2000)("[T]he appellant dropped out of school and has a sporadic employment record coupled with an extensive criminal record consisting primarily of theft and burglary offenses."). At the time of the offenses in this case, the presentence report does not indicate that Defendant Graham was employed. He reported that his last job prior to the offenses in this case was with Family Wholesale in Fayetteville, North Carolina from November 2009 to January 2010. Defendant reported that he left the job because he was "laid off." Defendant also reported working for Goodyear in Fayetteville, North Carolina from November of 2006 until July of 2008 and indicated that his reason for leaving was that he was also "laid off." Prior to that, Defendant reported that he worked for McDonald's in North Carolina from July 2002 until November 2006 when he went to work for Goodyear. The presentence report indicates that Defendant's employment information was "unverified." The report further indicates that Defendant Graham was involved in the distribution of drugs dating back to May of 2008 when he was convicted in North Carolina of cocaine possession and "maintaining [a] dwelling" for drug activity.

Additionally, Defendant admitted that he sold cocaine in order to provide for his family. *See State v. Marques Sanchez Johnson*, No. M2012-00163-CCA-R3-CD, 2012 WL 5188136, at \*4 (Tenn. Crim. App., Oct. 18, 2012)(Trial court correctly found that defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood. "Indeed, there was testimony in the record that [defendant] committed the thefts in part to provide for himself and his family."). We also note that in the presentence report, Defendant Graham reported that he had never used cocaine and that he only sold the drug.

The trial court also correctly found that Defendant Graham's record of criminal activity is extensive. This factor alone supports consecutive sentencing. "This factor has been interpreted to include not only the convictions presently before the sentencing court but also prior offenses." *State v. Palmer*, 10 S.W.3d 638, 647-49 (Tenn. Crim. App. 1999). As noted above, in 2009 Defendant Graham was convicted of the possession of cocaine and "maintaining [a] dwelling" for the use of the sale of controlled substances. The offenses occurred in May of 2008. In the present case, Defendant was convicted of eight additional felony drug-related offenses. Therefore, he had a total of ten felony

drug-related offenses, and he is an offender with an extensive criminal history. *See State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)(Consecutive sentencing upheld where a defendant with no criminal history was convicted of eight offenses in a single trial based on a finding that his record of criminal activity was extensive.).

Defendant Graham also argues that the trial court erred by ignoring the principles of "sentence entrapment" in imposing partial consecutive sentences in this case. This court addressed the issue of "sentence entrapment" in *State v. John Derrick Martin*, No. 1C01-9502-CR-00043, 1995 WL 747824 (Tenn. Crim. App., Dec. 19, 1995). In *Martin*, the trial court ordered the defendant's four drug convictions to run consecutively to each other, and an unrelated Kentucky sentence, for an effective sentence of forty years. On appeal this Court concluded that although the defendant qualified as a professional criminal and committed the offenses while on probation, the defendant's forty-year sentence for the drug offenses was not reasonably related to the severity of the four crimes. This court held:

> Because these were controlled buys, the officers dictated the number of counts. As such, the severity of the crimes could vary significantly depending upon the specific number of buys the officers chose to conduct and the amounts purchased in each buy. For this reason, we are of the opinion that a total sentence of twenty years for the drug cases is appropriate. Therefore, we modify the consecutive nature of the sentences such that the two ten-year sentences on similar counts one and two will run concurrently with each other and concurrently with all of the other counts including the two misdemeanor offenses. The remaining sentences will run consecutively to each other.

Defendant Graham further relies on *State v. Richard Lynn Norton*, No. E1999-00878-CCA-R3-CD, 2000 WL 1185384 (Tenn. Crim. App., Aug. 22, 2000) and *State v. William Lewis Houston*, No. M1999-01430-CCa-R3-CD, 2000 WL 1793088 (Tenn. Crim. App. Dec. 7, 2000) in support of his argument. However, as pointed out by the State, all of these cases precede the Tennessee Supreme Court's decisions in *Bise* and *Pollard*, which impose greater appellate deference to a trial court's sentencing determinations. In any event, these three cases do not undermine the imposition of partial consecutive sentencing in this case and Defendant Graham's thirty-seven-year sentence.

In *Norton*, the defendant was convicted of three drug offenses and received three consecutive sentences. Relying on *Martin*, the panel in *Norton* reduced the defendant's sentence from thirty-six to twenty-four years reasoning that the "imposition of three consecutive sentences would permit investigating officers to dictate the length of a sentence based upon the number of controlled buys they arrange and the amounts

purchased. *Norton*, 2000 WL 1185384, at *9. In *Houston*, the defendant was convicted of eight drug offenses and one count of aggravated assault. He received an effective seventy-two-year sentence. Based on *Martin* and *Norton*, this court concluded that the defendant should serve four of his sentences rather than six consecutively reducing the effective term of seventy-two years to forty-six years. This court further said:

> We recognize that this sentence is higher than those imposed in *Norton* and *Martin*. However, this defendant's drug and other criminal activity is more egregious. Two of the cases involved well over 26 grams of cocaine; namely, 49.1 grams and 80.5 grams. Five other cases involved well over 0.5 grams, namely, 1.9 grams, 6.7 grams, 13.9 grams, 20.3 grams and 17.2 grams. The counterfeit cocaine case was supposed to involve two ounces of cocaine. Furthermore, the evidence in this case reveals that defendant had drug contacts across the United States. We conclude that an effective sentence of forty-six years is appropriate under all the circumstances.

*Houston*, 2000 WL 1793088, at *13.

In this case, given the number of offenses as well as the amount of drugs involved in the offenses, Defendant Graham's thirty-seven year sentence is reasonably related to the severity of the offenses as specifically found by the trial court. Each of the controlled buys in this case involved well over .5 grams of cocaine, and four of the buys involved well over twenty grams. Defendant Graham also stated his intent in one of the recordings to obtain crack cocaine from someone in North Carolina. This issue is without merit.

We conclude that the trial court did not abuse its discretion in sentencing Defendant. Accordingly, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

34